IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

| | |
|---|---|
| CHRISTOPHER BILEK, individually and on behalf of others similarly situated,<br>    Plaintiff,<br><br>  v.<br><br>FEDERAL INSURANCE COMPANY d/b/a CHUBB, ERRANDS SERVICES (PVT.) LIMITED, GUIDESTAR MARKETING GROUP, LLC, INAM MALIK and DOES 1-10,<br>    Defendants. | Case No. 1:19-cv-08389<br><br>**Jury Trial Demanded** |

**CLASS ACTION**
**<u>AMENDED COMPLAINT</u>**

  1.  Plaintiff Christopher Bilek brings this action against Defendants Federal Insurance Company ("Chubb"), Errands Services (Pvt.) Limited ("Errands"), Guidestar Marketing Group, LLC ("Guidestar"), and Errands' and Guidestar's owner Inam Malik ("Malik") to secure redress for telemarketing calls made on Chubb's behalf to the cellular telephone numbers of Plaintiff and others using an automatic telephone dialing system and prerecorded voice, in violation of the Telephone Consumer Protection Act ("TCPA"), 47 U.S.C. § 227.

  2.  Errands is an overseas lead generator and call center engaged to generate business for Chubb; Defendant Malik is a principal of Errands. On information and belief, Malik uses Defendant Guidestar – of which he is also a principal – to generate marketing leads and phone numbers to call for Errands on behalf of Chubb.

  3.  Chubb should be held liable for the calls that are the subject of this case. Chubb knowingly accepts business derived from prerecorded telemarketing, and intentionally takes

insufficient steps to prevent such so that it can retain the telemarketing's benefits.

## INTRODUCTION

4. Advancements in telephone dialing technology by the 1980s and 90s made reaching a large number of consumers by telephone easier and more cost-effective. However, this technology has also brought with it an onslaught of unsolicited robocalls, spam text messages, and junk faxes that intrude on individual privacy and waste consumer time and money. As a result, the federal government and numerous states have enacted legislation to combat these widespread telecommunications abuses. As Congress recognized:

> Many customers are outraged over the proliferation of intrusive, nuisance calls to their homes…. Banning such automated or prerecorded telephone calls to the home, except when the receiving party consents to receiving the call or when such calls are necessary in an emergency situation affecting the health and safety of the consumer, is the only effective means of protecting telephone consumers from this nuisance and privacy invasion.

Pub. L. No. 102-243, 105 Stat. 2394 § 2(6, 12) (1991).

5. As is relevant here, federal law under the TCPA prohibits "mak[ing] any call (other than a call made for emergency purposes or made with the prior express consent of the called party) using any artificial or prerecorded voice … to any telephone number assigned to a … cellular telephone service[.]" 47 U.S.C. § 227(b)(1)(A)(iii). The TCPA provides for injunctive relief and the greater of actual damages or $500 per violation, which can be trebled where the statute was "willfully or knowingly" violated. 47 U.S.C. § 227(b)(3).

6. Defendants caused prerecorded calls to be made to Plaintiff's cell phone without his consent, and Plaintiff files this class action complaint on behalf of himself and others similarly situated, seeking relief from Defendants' illegal calling practices.

## PARTIES

7. Plaintiff Christopher Bilek is a natural person who resides in Cook County,

Illinois.

8. Defendant Federal Insurance Company d/b/a Chubb ("Chubb") is an Indiana corporation headquartered at 251 North Illinois Street, Suite 1100, Indianapolis, Indiana 46204. Federal Insurance Company is an affiliate and member of the Chubb Limited family of companies. *See* Chubb Ltd. SEC Form 10-K, Exhibit 21.1 (https://www.sec.gov/Archives/edgar/data/0000896159/000089615922000005/cb-12312021xex211.htm) (Feb. 24, 2022).

9. Defendant Errands Services (Pvt.) Limited is a Pakistan corporation with a registered address at Suite 13, First Floor, Mid City Mall, Main Murree Road, Rawalpindi, Punjab 44000, Pakistan, near the Rehmanabad Metro Bus Station.[1] Errands also maintains a location at First Floor, Tokyo Center, Iran Road, Block A Satellite Town, Rawalpindi, Pakistan, opposite Azmat Hospital. Errands also maintains a call center at 3rd Floor, Laraib Centre (MCB Bank), I-8 Markaz, Islamabad, Pakistan.

10. Guidestar Marketing Group, LLC is a Wyoming limited liability company with a principal place of business at 30 North Gould Street, Suite 24935, Sheridan, Wyoming 82801. Defendant Inam Malik owns and operates Guidestar Marketing Group, LLC.

11. Inam Malik a/k/a Inam Ul Haq ("Malik") is a natural person who resides in Islamabad, Pakistan. Malik owns or is a principal of both Errands and Guidestar, and directs and coordinates these entities' lead generation and telemarketing efforts for Chubb's benefit.

12. DOES 1-10 are yet-unidentified persons or entities involved in facilitating the lead generation or calling at issue.

**JURISDICTION AND VENUE**

---

[1] *See* https://eservices.secp.gov.pk/eServices/NameSearch.jsp (Pakistan business registry shows Registration No. 0094061 for Errands).

13. This Court has federal question subject matter jurisdiction over this action pursuant to 28 U.S.C. § 1331 with respect to Plaintiff's TCPA claims. *Mims v. Arrow Financial Services, Inc.*, 132 S. Ct. 740 (2012).

14. The Court has personal jurisdiction over Defendants and venue is appropriate in this District under 28 U.S.C. § 1391(a) because Defendants do business in this District, caused the calls that are the subject of this lawsuit to be made to Plaintiff and others in this District, generated sales of insurance products through such calls and lead generation targeted at consumers like Plaintiff in this District, and because a substantial portion of the events giving rise to this cause of action occurred in this District.

## FACTS

15. On or about September 20, 2019, Plaintiff received a call to his cell phone number from (847) 238-3767, at approximately 3:51 p.m.

16. This call was made by Errands and Malik for the purpose of marketing Chubb products and services.

17. The call played a prerecorded message that solicited health insurance and instructed Plaintiff to "press 1" to be connected with a representative.

18. After Plaintiff followed the automated prompt and pressed 1 on his phone, he was connected to a live agent, who provided Plaintiff with a $171/month quote for health insurance (plus a $99 one-time fee), underwritten by Chubb.

19. At the direction of Malik, Errands made other calls to Plaintiff, as well, including three calls on September 26, 2019: (1) from (708) 875-9207 at 11:40 a.m., (2) from (708) 876-9910 at 12:22 p.m., and (3) from (708) 877-6037 at 12:49 p.m. These calls also played prerecorded-voice messages, and were made to solicit for Chubb.

20. Errands made its calls to Plaintiff using a Vicidial dialer platform provided by another company called Telcast. Telcast has produced records reflecting these calls, as well as more than a million other calls Errands made with it, some or all of which were made for the purpose of trying to sell Chubb insurance.

21. For example, when Plaintiff answered the 12:49 p.m. call on September 26, 2019, the call played the same prerecorded message as the September 20, 2019, call, which solicited health insurance and instructed Plaintiff to "press 1" to be connected with a representative.

22. After Plaintiff followed the automated prompt and pressed 1 on his phone, he was again connected to a live agent, who again provided Plaintiff with a quote for Chubb health insurance.

23. The "Chubb" insurance referenced by the sales agents during the calls to Plaintiff was for Federal Insurance Company. Alternatively, it was for a different member of the "Chubb" family of companies, whose identity will be identified through discovery.

24. The calls made by or on behalf of Defendants to Plaintiff's cell phone number used an artificial or prerecorded voice, as evidenced by the awkward pacing and intonation that audibly differed from a "live" human voice, as well as the instruction that Plaintiff "press 1."

25. Given how prolific caller ID spoofing and unsolicited calls are, it difficult for a consumer to tell which phone incoming calls are "regular," legitimate calls, which calls are unsolicited telemarketing and which are outright fraud. Upon information and belief, Plaintiff received other calls from or on behalf of Defendants, too.

26. As Chubb knows, it is the practice of the telemarketers and lead generators who telemarket to try to sell Chubb goods and services to spoof caller ID, and to change caller IDs in disparate calls to a particular consumer, so that recipients cannot tell who is calling them before

picking up.

27. Errands spoofed the caller IDs used to call Plaintiff and other class members, to make its calls look like they were being made locally and not from Pakistan.

28. Guidestar—which is Malik's lead generation company—materially participated in making the calls at issue, as well.

29. On information and belief, Guidestar secured Plaintiff's and other class members' phone numbers for the calls at issue, and worked in concert through Malik with Errands to make them.

30. No Defendant had permission or consent for the calls to Plaintiff or the class identified below.

31. Errands, Malik and Guidestar's business model is to generate insurance leads derived through autodialed and prerecorded calls to consumers' cellular telephone numbers regardless of consent, and transfer calls to Chubb insurance agents – or other telemarketing entities which then transfer the calls to Chubb agents – if the recipient indicates interest.

32. The purpose and effect of this process is that it is very difficult to unravel who is responsible for calls.

33. Errands' autodialing is prolific. In the week between September 20, 2019, and September 27, 2019, for example, Errands made more than 1.8 million calls to Americans—including telemarketing for health insurance in calls through which Chubb insurance was sold.

34. Errands is not the only telemarketer that has violated the TCPA or ATDA soliciting on Chubb's behalf.

35. Chubb's policies, practices and procedures that apply to generating business for it insist upon controlling – and maintaining the ability to control – the day-to-day operations. For

example:

    a. Chubb maintains the right to give or modify instructions about telemarketing or any other aspect of their relationship at any time;

    b. Chubb maintains the right to terminate at any time for any reason;

    c. Chubb retains the right to participate in disciplinary, hiring and firing decisions;

    d. Chubb maintains the right to reject any particular potential or existing customer obtained through telemarketing, for any reason at all,

    e. Chubb dictates the geographical regions for calls,

    f. Chubb enjoyed and maintained the right to control and approve the manner in which telesales are generated or solicited, including the manner and content of any advertising (although it often willfully disregards this right);

    g. Chubb enjoys and exercises the right to require those telemarketing on its behalf to engage in specialized training, including telemarketing training;

    h. Chubb maintains the unilateral right to reduce or suspend authority to solicit business and telemarket for any reason upon written notice;

    i. Chubb enjoys the right to audit telemarketing efforts, and required its agents and those telemarketing on its behalf to record telemarketing calls and share those recordings with Chubb. Chubb employs specific criteria to gauge the effectiveness of telemarketing efforts, but willfully and recklessly does not generally apply such efforts to assess TCPA compliance;

    j. Chubb enjoys the right to audit and inspect financial and account records upon demand, and exercised these rights during the class period;

    k. Chubb mandates that all agents and subagents maintain records of all

telemarketing calls made by them and their lead generator/telemarketing vendors as well as "proof of compliance" with the TCPA for no less than seven years, and provide such to Chubb upon demand;

l. Chubb mandates that agents and subagents maintain a log of complaints they had received, including telemarketing complaints, but only required complaints that mentioned "Chubb" to be automatically forwarded to Chubb. Nevertheless, all agents and subagents were required to send their complaint log for inspection by Chubb or its designated auditor upon request.

36. Chubb has continued to retain the benefits of the sales and business generated through Errands' and other vendors' nonconsensual robocalls, including revenue received from customers who purchased Chubb insurance during or as a result of such calling.

37. Chubb has phone number and other demographic information on its customers, through which it can tell which it obtained through Errands or other telemarketing (sub)vendors.

38. Errands and Chubb's other lead generators had Chubb's express (or, at the very least, implied) actual authority to place the nonconsensual, automated lead generation calls at issue. Chubb contracted with agents and lead generators to effectuate this marketing. Chubb knows that its vendors and subvendors like Errands generate business on its behalf through illegal telemarketing, but inexplicably keeps accepting business derived through their calls, anyway.

39. Likewise, Chubb imbued lead generators and telemarketers making calls to try to sell its products and services, including Errands, with apparent authority for the calling at issue by permitting its agents and lead generators authority to use its tradename and providing proprietary pricing and product information for use during such calls.

40. Chubb also ratified the calling at issue: It knowingly accepted the benefits of their lead generators' nonconsensual, automated calling—including the benefits of advertising of its insurance, issuance of quotes, and sales.

41. Indeed, Chubb has been sued in the past for similar telemarketing violations, and its executives and legal team were on actual notice that its practices were resulting in nonconsensual, automated calls to consumers' cell phones like those alleged here. *See, e.g., Hossfeld v. Am. Fin. Sec. Life Ins. Co.,* No. 0:19-cv-60597 (S.D. Fla. filed Mar. 6, 2019) (suing, inter alia, Chubb and HII for TCPA violations); *Cunningham v. Health Plan Intermediaries Holdings, LLC*, No. 1:17-cv-01216 (N.D. Ill. filed Feb. 15, 2017) (same). Nonetheless, Chubb has continued to reap the benefits of these illegal calls, choosing profits over individual consumer privacy.

42. Plaintiff and the class have been damaged by Defendants' calls. Their privacy was improperly invaded, Defendants' calls temporarily seized and trespassed upon the use of their phones, and they were forced to divert attention away from other activities to address the calls. Defendants' calls were annoying and a nuisance, and wasted the time of Plaintiff and the class. *See, e.g., Mims v. Arrow Fin. Servs., Inc.*, 132 S. Ct. 740 (Jan. 18, 2012) (discussing congressional findings of consumer "outrage" as to autodialed and prerecorded calls).

## CLASS ACTION ALLEGATIONS

43. Plaintiff brings this action under Federal Rules of Civil Procedure 23(b)(2) and (b)(3), on behalf of a class and subclass consisting of:

> All persons in the United States whose cellular telephone number Chubb, or some third party on its behalf such as Errands or Guidestar, called using an artificial or prerecorded voice or the same or similar dialing system used to call Plaintiff, where prior to such call there existed no signed, written agreement with the recipient that included a disclosure informing the person signing that: (A) By executing the agreement, such person authorizes Chubb to deliver or cause to be delivered to the

signatory telemarketing calls using an automatic telephone dialing system or an artificial or prerecorded voice; and (B) the person is not required to sign the agreement (directly or indirectly), or agree to enter into such an agreement as a condition of purchasing any property, goods, or services.

Plaintiff alleges a subclass of Illinois consumers who received the challenged calls.

44. Upon information and belief, there were more than 100,000 persons who received calls as identified in the foregoing class and subclass definitions in 2019, alone.

45. Common questions of law or fact exist as to all members of the class, which predominate over any questions solely affecting any individual member, including Plaintiff. Such questions common to the class include but are not limited to:

    a. Whether the calls to Plaintiff and the class were made using an "automatic telephone dialing system" or "autodialer" as such terms are defined or understood under the TCPA, ATDA, and applicable regulations and orders;

    b. Whether the calls to Plaintiff and the class were made using an artificial or prerecorded voice as such terms are defined or understood under the TCPA and applicable FCC regulations and orders

    c. Whether Defendants had valid consent for calls to the cell phone numbers of Plaintiff and the other members of the class; and

    d. Damages, including whether any violations were performed willfully or knowingly, such that Plaintiff and the other members of the class are entitled to treble damages under 47 U.S.C. § 227(b)(3).

46. Plaintiff's claims are typical of the claims of the other members of the class and subclass. The factual and legal bases of Defendants' liability to Plaintiff and the other class members are the same: Defendant violated the TCPA and ATDA by causing automated

telemarketing calls to be made to the cell number of each class member, without permission.

47. Plaintiff will fairly and adequately protect the interests of the class and subclass. Plaintiff has no interests that might conflict with the interests of the class and subclass. Plaintiff is interested in pursuing his claims vigorously, and he has retained counsel competent and experienced in class and complex litigation, including with regards to the claims alleged herein.

48. Class action treatment is superior to the alternatives for the fair and efficient adjudication of the controversy alleged herein. Such treatment will permit a large number of similarly situated persons to prosecute their common claims in a single forum simultaneously, efficiently, and without the duplication of effort and expense that numerous individual action would entail. There are, on information and belief, thousands of class and subclass members, such that joinder of all members is impracticable.

49. No difficulties are likely to be encountered in the management of this action that would preclude its maintenance as a class action, and no superior alternative exists for the fair and efficient adjudication of this controversy.

50. Defendants have acted and failed to act on grounds generally applicable to Plaintiff and the other members of the class and subclass, thereby making relief appropriate with respect to the class as a whole. Prosecution of separate actions by individual members of the class, should they even realize that their rights have been violated, would likely create the risk of inconsistent or varying adjudications with respect to individual members of the class that would establish incompatible standards of conduct.

51. The identity of the class is, on information and belief, readily identifiable from Defendants' or their vendors' records.

## COUNT I
**Violations of the TCPA, 47 U.S.C. § 227**

52. Plaintiff re-alleges and incorporates all prior allegations.

53. It is a violation of the TCPA to make "any call (other than a call made for emergency purposes or made with the prior express consent of the called party) using any automatic telephone dialing system or an artificial or prerecorded voice … to any telephone number assigned to a … cellular telephone service…." 47 U.S.C. § 227(b)(1)(A)(iii).

54. Defendants initiated or caused to be initiated calls to the cellular telephone numbers of Plaintiff and the other members of the class and subclass defined above using an artificial or prerecorded voice. These calls were made without regard to whether or not Defendants had previously obtained express permission from the called party to make such calls. In fact, Defendants did not have prior express consent to call the cell phones of Plaintiff and the other members of the class and subclass when the calls were made.

55. These calls were willful or knowing.

56. Defendants violated the TCPA by causing non-emergency calls to be made to the cell phones of Plaintiff and others using an automatic telephone dialing system or an artificial or prerecorded voice, without prior express consent.

57. To the extent that some of the calls to Plaintiff and the class and subclass were made by vendors of Defendants, Defendants are liable for those calls, too.

58. As a result of Defendants' conduct and pursuant to Section 227(b)(3) of the TCPA, Plaintiff and the other members of the class and subclass were harmed and are each entitled to a minimum of $500 in damages for each violation; treble damages if violations are found to have been willful. Plaintiff and the class and subclass are also entitled to an injunction against future calls. 47 U.S.C. § 227(b)(3).

59. Because Defendants knew or should have known that Plaintiff and the other

members of the class and subclass had not given prior express consent to receive such automated calls to their cell phones—and/or willfully caused automated calls to be made to the cell phones of Plaintiff and the other members of the class and subclass without prior express consent—the Court should treble the amount of statutory damages available to Plaintiff and the other members of the class, pursuant to Section 227(b)(3) of the TCPA.

WHEREFORE, Plaintiff Christopher Bilek, individually and on behalf of the class and subclass, respectfully requests that the Court enter judgment against Defendants for:

    A.    Certification of the class and subclass as alleged herein;

    B.    A declaration that Defendants violated the TCPA as to Plaintiff and the class and subclass;

    C.    Damages, pursuant to 47 U.S.C. § 227(b)(3);

    D.    Injunctive relief, pursuant to 47 U.S.C. § 227(b)(3), aimed at ensuring the prevention of Defendants from violating the TCPA in the future, including:

        1. Requiring Defendants to hire a Court-approved, independent auditing company to (a) investigate all allegations of TCPA violations, and (b) audit no less than 10% of Defendants' and their vendors' outbound calls – including calls originating from lead generators – to ensure that Defendants had consent and that the consumer had not previously asked that calls stop, and (c) report the results of the above investigations to the Court and Plaintiff's counsel on a quarterly basis for no less than five years.

        2. Requiring Defendants to include a working, automated IVR opt-out mechanism at the beginning of any and all prerecorded-voice calls;

    E.    Attorneys' fees and costs, as permitted by law; and

    F.    Such other or further relief as the Court deems just and proper.

**COUNT II**
**Violations of the ATDA, 815 ILCS 305/1** ***et seq.***

60.    Plaintiff re-alleges and incorporates all prior allegations.

61. The ATDA prohibits "play[ing] a prerecorded message placed by an autodialer without the consent of the called party." 815 ILCS 305/30(b).

62. Under the ATDA, an "autodialer" or "autodialer system" is defined as "any telephone dialing or accessing device, machine, computer or system capable of storing telephone numbers which is programmed to sequentially or randomly access the stored telephone numbers in order to automatically connect a telephone with a recorded message[.]" 815 ILCS 305/5(a).

63. A "recorded message" refers to "any taped communication soliciting the sale of goods or services without live voice interaction." 815 ILCS 305/5(c).

64. Defendants violated the ATDA by playing prerecorded messages placed by an autodialer during calls to the phones of Plaintiff and the subclass members, without such persons' consent.

65. Defendants' prerecorded messages to the phones of Plaintiff and the other subclass members included language soliciting the sale of goods or services without live voice interaction, including offering insurance or medical discount-related products.

66. As a result of Defendants' conduct and pursuant to Section 30(c)-(c-5) of the ATDA, Plaintiff and the other members of the subclass were harmed and are each entitled to statutory damages of $500 per violation and three times any actual damages, as well as costs and attorneys' fees. 815 ILCS 305/30(c)-(c-5).

WHEREFORE, Plaintiff Christopher Bilek, individually and on behalf of the subclass, respectfully requests that the Court enter judgment against Defendants for:

    A.    Damages, pursuant to 815 ILCS 305/30;

    B.    Attorneys' fees and costs, as permitted by law; and

    C.    Such other or further relief as the Court deems just and proper.

## COUNT III
### Violations of the ATDA, 815 ILCS 305/1 *et seq.*

67. Plaintiff re-alleges and incorporates all prior allegations.

68. The ATDA prohibits "mak[ing] or caus[ing] to be made telephone calls utilizing an autodialer in a manner that does not comply with Section 15." 815 ILCS 305/30(a).

69. Section 15 of the ATDA, in turn, provides that "[a]n autodialer may not be operated in a manner that impedes the function of any caller ID when the telephone solicitor's service or equipment is capable of allowing the display of the solicitor's telephone number." 815 ILCS 305/15(d).

70. Defendants' telemarketing calls above were made with the Caller ID set to deceive consumers into answering calls they would not otherwise answer.

71. While the service or equipment used to make such calls was capable of allowing the display of a legitimate telephone number, the calls were made instead using disparate caller IDs, designed to trick consumers into answering calls.

72. As a result of Defendant's conduct and pursuant to Section 30(c)-(c-5) of the ATDA, Plaintiff and the other members of the subclass were harmed and are each entitled to statutory damages of $500 per violation and three times any actual damages, as well as costs and attorneys' fees. 815 ILCS 305/30(c)-(c-5).

WHEREFORE, Plaintiff Christopher Bilek, individually and on behalf of the subclass, respectfully requests that the Court enter judgment against Defendants for:

    A.    Damages, pursuant to 815 ILCS 305/30;

    B.    Attorneys' fees and costs, as permitted by law; and

    C.    Such other or further relief as the Court deems just and proper.

**JURY DEMAND**

Plaintiff requests a trial by jury of all claims that can be so tried.

Respectfully submitted,

Dated: September 16, 2022

CHRISTOPHER BILEK, individually and on behalf of others similarly situated

By: _/s/ Alexander H. Burke_

Alexander H. Burke
Daniel J. Marovitch
**BURKE LAW OFFICES, LLC**
909 Davis St., Suite 500
Evanston, IL 60201
Telephone: (312) 729-5288
aburke@burkelawllc.com
dmarovitch@burkelawllc.com

*Counsel for Plaintiff*

**Document Preservation Demand**

Plaintiff demands that each Defendant preserve all records, and direct that all vendors, agents and other third parties with relevant documents or data do so, too. Plaintiff will assist with reasonable costs of preservation; please contact the attorneys listed here to discuss.